FILED

2007 Mar-30  PM 06:23
U.S. DISTRICT COURT
N.D. OF ALABAMA

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
NORTHEASTERN DIVISION

| | | |
|---|---|---|
| **CITY OF DECATUR, ALABAMA,** | ) | |
| | ) | |
| Plaintiff and | ) | |
| Counterclaim Defendant, | ) | |
| | ) | Civil Action Number |
| **vs.** | ) | **5:04-cv-01265-UWC** |
| | ) | |
| **FALCON CABLEVISION, L.P.,** | ) | |
| | ) | |
| Defendant and | ) | |
| Counterclaim Plaintiff. | ) | |

**MEMORANDUM OPINION ON  MOTIONS
FOR SUMMARY JUDGMENT**

Plaintiff City of Decatur ("the City") has moved for summary judgment on all Defendant-Counterclaim Plaintiff Falcon Cablevision's ("Falcon") counterclaims. (Doc. 46.)  Falcon has filed a Motion for Summary Judgment on all of the City's claims and certain of its counterclaims. (Doc. 27.)

For the reasons outlined in this Opinion, Falcon's Motion for Summary Judgment is due to be denied, and the City's Motion for Summary Judgment on certain of Falcon's counterclaims is due to be granted.

**Introduction**

1

This cause was commenced on June 17, 2004, arising out of a cable television franchise between the City and Falcon or its predecessor. In its complaint, the City makes three requests for declaratory relief. First, it seeks a declaration that the Pole Attachment Agreement, the Franchise Agreement, the Multichannel Service Provider Ordinance ("MCSP Ordinance"), and the 1998 and 2000 agreements which it executed with Falcon or its predecessor, are lawful under the Laws of the State of Alabama, and that Falcon is obliged to comply with the applicable provisions of each agreement and the ordinance. Secondly, the City seeks a declaration that Falcon is bound to comply with all of the safety standards contained in the National Electric Safety Code ("NESC") and the National Electric Code ("NEC"). Finally, the City seeks a declaration that Falcon has failed to comply with the obligations under the NEC, NESC, MCSP Ordinance, 1998 Franchise Agreement, and 2000 Franchise Agreement.

In its answer, Falcon pled the general issue and asserted seven counterclaims. It seeks summary judgment on three of these: (1) Count I, which alleges that the City violated Falcon's rights of due process and equal protection under 42 U.S.C. § 1983; (2) Count II, under which Falcon asserts that the MCSP Ordinance is preempted by the Cable Act, 47 U.S.C. § 521 *et seq.* and other federal laws; and (3) Count III, which alleges a breach of contract by the City.

## THE UNDISPUTED FACTS

Falcon presently holds a cable television franchise in the City of Decatur,

Alabama, and through prior entities, has held the current franchise since 1988. On August 1, 1988, the City entered into a Franchise Agreement with Decatur TeleCable Corporation granting it the non-exclusive right to construct and maintain a cable television system within the City and to make attachments to City-owned property "at such rates and upon such terms and conditions as shall from time to time be determined by the City." (Pl.'s Mot. for Summ. J., Doc. 46, Ex. 4 at 2-3.) Section 3 of the 1988 Franchise provides that "[t]he construction, operation and maintenance of the system by the company shall be in accord with good engineering practices and shall be in full compliance with the National Electrical Safety Code and applicable laws, regulations and ordinances as such are from time to time amended and revised." (Doc. 46, Ex. 4 at 3.) In 1995, Decatur TeleCable Corporation changed its name to "TCI of Decatur, Inc." ("TCI ").

In January 1997, the City and TCI entered into a Pole Attachment Agreement which governs the terms and conditions under which the franchisee could attach its cable system to City-owned utility poles. Article II of the 1997 Pole Attachment Agreement, entitled "Specifications," provides, in pertinent part, that "[l]icensee's cables, wires and appliances, in each and every location, shall be erected and maintained in accordance with the requirements and specifications of the latest revision of the National Electrical Safety Code . . . and in compliance with any rules or orders now in effect or that may hereinafter be issued by the Licensor or other

authority having jurisdiction" and that "[f]ailure of Licensee to comply with this Article . . . shall constitute a default of this Agreement on the part of Licensee." (Doc. 46, Ex. 6 at 2.)  The 1997 Pole Attachment Agreement further provides that "[l]icensee shall, at its own expenses, make and maintain its pole and anchor attachments in a safe condition, in good repair, and in a manner acceptable to Licensor." (*Id.* at 6.)  Pole attachment agreements are administered by Decatur Utilities ("DU"), an agency of the City which owns and manages City-owned utility poles.

By a letter dated June 26, 1997, TCI informed the City that it was considering a partnership with Falcon Cable, and that said partnership would "be responsible for meeting all of [TCI's] obligations under [its] franchise with [the City]." (Doc. 46, Ex. 7.)  The letter indicated that any consent to the formal transfer of the franchise would be sought once a definitive agreement on the proposed partnership was reached.  (*Id.*)

In October 1997, the City retained Monroe Telecom Associates, LLC, through its principal Lawrence Monroe (collectively "Monroe"), to provide assistance in regulating the City's cable service providers.  Specifically, Monroe was retained to conduct a review of the franchisee's compliance with its obligations under the Franchise Agreement, including those obligations relating to the construction and maintenance of the cable system.

On November 25, 1997, Monroe issued a report on the inspection of the cable system operated by TCI, concluding that TCI's system was not fully compliant with

technical standards of the Federal Communications Commission and that the construction of the physical cable plant was below the written standards of the NEC and NESC in several respects.  (*See* Doc. 46, Ex. 8 at 2-3.)  A copy of the report was provided to TCI.

Two months later, on January 2, 1998, Monroe prepared a report concerning the overall compliance of TCI with its obligations under the Franchise Agreement.  The January 1998 report concluded that TCI was not in compliance with those provisions of its Franchise Agreement relating to the safety and construction of the physical plant, the payment of franchise fees, and issues pertaining to the transfer of the franchise. (*See* Doc. 46, Ex. 9 at 2.)  A copy of the report was provided to TCI.

In a letter dated February 27, 1998, TCI responded to both the November 1997 and January 1998 Monroe reports.  In its response, while TCI disputed several of Monroe's conclusions, TCI did not dispute that the construction of its system was subject to compliance with the standards of the NEC and NESC.  Moreover, TCI represented that a large number of violations identified in the reports had been remedied or corrected.  (*See* Doc. 46, Ex. 10.)

TCI formally requested, by letter dated March 5, 1998, the City's consent to the transfer of the franchise from itself to Falcon Communications, now known as Falcon Cablevision, L.P. ("Falcon").  That same month, copies of Monroe's reports were provided to DU on March 10, 1998.  Based on its own review and inspection of the

cited violations, DU confirmed that all but a few of the observed conditions were, in fact, violations of the NESC and/or Franchise Agreement, and that only some of those conditions had been corrected by TCI.

Monroe conducted a re-inspection of the cable system and issued another report on May 23, 1998. The re-inspection purported to identify over 379 instances in which the construction and maintenance of the cable system deviated from the requirements of the NESC, NEC, and/or Franchise Agreement. (*See* Doc. 46, Ex. 14.)

Roughly a month later, on June 15, 1998, based on the findings in the Monroe reports, the City adopted a Resolution finding TCI to be in noncompliance with the material terms of the Franchise, and in default thereunder. A copy of the Resolution was provided to TCI in a letter dated June 17, 1998. In the letter, the City stated that it would not "grant the request for transfer of the cable television franchise as long as there [were] violations of the franchise that remain uncured, and as long as TCI [was] in violation and default of the franchise." (Doc. 46, Ex. 15 at 1.)

On March 2, 1998, the City adopted an Ordinance referred to as the Multichannel Service Provider Ordinance ("MCSP Ordinance") for the purpose of further regulating certain aspects of the cable systems operating within the City. The MCSP Ordinance was subsequently amended in July 1998 and May 1999. The July 1998 amendments expressly require compliance with the NEC and NESC, as well as more stringent clearance requirements on the utility poles between the wires and

various licensees.

Because the terms of the MCSP Ordinance altered certain of the clearance requirements included as "Exhibit D" to the 1997 Pole Attachment Agreement, a revised "Exhibit D" incorporating the amended clearance requirements was provided to TCI and the City's other cable provider, PCL Cable ("PCL"), by letters dated August 27, 1998.

In August 1998, the City, TCI, and Falcon began negotiating the terms of an agreement by which the City would agree to the proposed transfer of the Franchise Agreement to Falcon in exchange for Falcon's commitment to bring the cable system into compliance with the applicable construction standards.  An agreement was subsequently reached and executed between the parties on September 2, 1998.

The September 1998 Agreement provides,

> Falcon will perform an evaluation of all safety violations in the City under the current franchise immediately and all safety violations will be resolved to applicable codes through a systematic rebuild/upgrade of the cable system, which will be completed within a maximum of three (3) years.

(Doc. 46, Ex. 19 at 2.)   The agreement further obligates Falcon to provide the City with a surety bond within thirty days in the amount of $1,000,000.00 to ensure the performance of the rebuild and the elimination of safety violations within the cable system, which could be drawn upon by the City in the event that Falcon failed to comply with any of the terms and conditions of the agreement.  (*Id.* at 4.)   The agreement extended Falcon's franchise for a period of twelve (12) years, in exchange

for which Falcon agreed to pay the City $200,000.00.  (*Id.* at 5.)  Falcon also agreed

to make available to the City thirty (30) megahertz ("MHz") of dedicated spectrum

bandwidth subsequent to the completion of the cable system rebuild and upgrade.

The next month, on October 19, 1998, the City and Falcon entered into a revised

Pole Attachment Agreement, which included the requirement that the cable system be

constructed and maintained in compliance with the NESC and contained a new

"Exhibit D," which increased certain of the clearance requirements from thirty (30)

inches to forty (40) inches of clearance, as provided under the MCSP Ordinance.

On June 23, 1999, Falcon informed the City that Charter Communications

Holding Company ("Charter") had agreed to acquire a controlling interest in the parent

company of Falcon, and requested the City's consent to the acquisition. The parties

reached an agreement reflected in a letter dated February 4, 2000, and signed by both

parties.  The letter stated, in pertinent part,

> Charter is committed to completion of the rebuild of the Decatur cable system and full
> compliance with the Franchise and with the Agreement (Resolution No. 98-216) dated
> September 2, 1998. . . .  As part of the rebuild and our ongoing maintenance program,
> any safety violations will be fixed in accordance to NEC and NESC standards.

(Doc. 46, Ex. 22 at 2.)  Charter also stated that it was "fully committed to compliance

with the 1998 Agreement which provides for the 30 MHz of bandwidth for the City.

(*Id.*)

Based on this agreement, the City approved the transfer of control of Falcon to

Charter.  The record franchise holder continued to be Falcon Cablevision, L.P.,

-8-

although many communications regarding the franchise and various agreements were done through both Falcon and Charter.

In December 2000, Russell Bogie ("Bogie"), acting on behalf of the City, conducted a re-inspection of Falcon's cable system to determine the extent to which the system had been brought into compliance with the requirements of the NEC and NESC.  Bogie issued a January 3, 2001, report, in which he found over 84 instances of noncompliance with the NESC.  Bogie concluded:

> Except in the area of drop attachments to power masts and required markers on guy wires, little else has been done. . . . Today, the rebuild is essentially physically complete and not only do most of the original violations remain, the rebuild process has even created new violations.

(Doc. 46, Ex. 23 at 5) (emphasis in original).  A copy of Bogie's report was provided to Charter.

On October 31, 2001, Bogie issued another re-inspection report of Falcon's cable system.  In this report, Bogie found 376 instances of noncompliance with NEC and NESC standards in Falcon's reconstructed cable plant.  (Doc. 46, Ex. 24 at 7-13.) A copy of the October 2001 Bogie report was provided to Falcon.

Over two years later, in December 2003, Bogie conducted a third inspection of Falcon's cable system.  In this January 19, 2004, report,  Bogie found that less than half of the violations noted in his prior reports had been corrected as of the  most recent inspection, including 57 instances of noncompliance with the NEC and NESC

that did not require third party "make-ready"[1] work to remedy.  (*See* Doc. 46, Ex. 25 at 6-7.)  Bogie concluded:  "The fact that we were able to identify so many uncorrected previously reported non-third party violations in such a brief inspection (without having to "search" for them) indicates that they have made no such effort, at least in any meaningful sense."  (*Id.* at 7.)

On January 5, 2004, the City Council adopted Resolution No. 04-003, which authorized the commencement of this action.

The Franchise Agreement assumed by Falcon in 1998 has at all times remained in effect.  The City has taken no action to terminate Falcon's franchise.  The City has not levied or collected any fines, penalties, or administration costs against Falcon or Charter, pursuant to Sections 9(h), 15, 107, 113, or 126 of the MCSP Ordinance.

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate where the moving party demonstrates that there is no genuine issue as to any material fact and that, based upon the undisputed facts, the movant is entitled to judgment as a matter of law.  *See Earley v. Champion Int'l Corp.*, 907 F.2d 1077, 1081 (11th Cir. 1990); *see also* Fed. R. Civ. P. 56(c).

The party requesting summary judgment always has the burden of

---

[1] A "make-ready" is a request to a provider, frequently the power company, to change something on the pole, such as moving its wires or transformer, or in some cases, by setting a taller utility pole in place of the existing pole.

demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)). "All doubts as to the existence of a genuine issue of material fact must be resolved against the moving party." *See Hayden v. First Nat'l Bank of Mt. Pleasant*, 595 F.2d 994, 996-97 (5th Cir. 1979).   Evidence that is merely colorable, conclusory, or conjectural does not create a genuine issue of material fact. *See, e.g.*, *Brown v. City of Clewiston*, 848 F.2d 1534, 1537 (11th Cir. 1988); *Peppers v. Coates*, 887 F.2d 1493, 1498 (11th Cir. 1989).

## ANALYSIS

### I. Falcons's Motion for Summary Judgment on the City's Declaratory Judgment Claims

Falcon seeks summary judgment on the City's three requests for declaratory judgment relief. Each count will be addressed in turn.

In the first count of its complaint, the City seeks a declaration that "the NESC and NEC sections listed in the Bogie Reports are applicable and required to be complied with under the Pole Attachment Agreement, the Franchise, MCSP Ordinance, 1998 Agreement, and 2000 Agreement." (Compl. ¶ 46.)  Further, the City requests a declaration that "Defendants are obligated to comply with the terms and conditions of the Pole Attachment Agreement, Franchise, MCSP Ordinance, 1998 Agreement, and 2000 Agreement and that these ordinances/agreements are lawful under the Laws of the State of Alabama." (Compl. ¶ 47.)

Falcon  moves for summary judgment on this count, arguing that certain

-11-

sections in these agreements and ordinances are not in issue and not ripe. Falcon further argues the MCSP Ordinance is clearly unlawful, and the City misinterprets facts and law with respect to the NESC and NEC provisions at issue at this case.

The City responds that because Falcon is arguing that the portions of the NESC and NEC cited in the Bogie reports are either waived, modified in practice by DU, or require proof of cause, a declaration regarding the City's right and entitlement to enforce these provisions is ripe.

Pursuant to 28 U.S.C. § 2201(a), declaratory judgment relief is reserved for instances where there is "a case of actual controversy." 28 U.S.C. § 2201(a). Faced with this identical issue in a case involving the same defendant in *City of Athens, Ala. v. Charter Commc'n Holding Co.*, No. 03-2430, memo op. at 54-55 (N.D. Ala. July 7, 2005), the Court observed:

> The City has adduced evidence demonstrating the existence to some degree of a controversy with respect to the validity of the Cable Ordinance and the Pole Attachment Agreements. Indeed, as noted by the City, in Charter's second Counterclaim, Charter sought a declaration that the Cable Ordinance was "preempted" by the Cable Act and that the Ordinance therefore was void "to the extent [it] is preempted." (internal citation omitted) With respect to the Pole Attachment Agreement, Charter has sought to enjoin its enforcement to the extent that its enforcement produces fines in excess of the amount of the franchise fees authorized by the Cable Act. Thus, it is clear that controversies over the validity of the Cable Ordinance and the Pole Attachment Agreement exist; it merely is unclear to what extent the City has called their validity into question.
>
> Even so, this conclusion— that genuine factual issues exist as to the extent to which there is controversy over the validity of these agreements—is sufficient to require the court to DENY Charter's motion for summary judgment on this count. Moreover, Charter has failed to cite any authority supporting its position that the City is precluded from obtaining partial relief on its count for a declaration. Thus, even if Charter had

-12-

not challenged the validity of the Cable Ordinance and the Pole Attachment Agreement in their entirety, Charter would have failed to demonstrate its entitlement to summary judgment . . . .

No. 03-2430, memo op. at 54-55 (emphasis in original).

The issues addressed by the *Athens* case are relevant in this action.

In its motion for summary judgment, Falcon argues that there is no evidence that it violated the NESC or NEC "as they were being applied by DU," that the inspection reports on which the City relies do not establish that Falcon caused the alleged discrepancies, and that the City has waived strict compliance with the technical standards the City's declaration seeks to affirm. This position is strongly disputed by the evidence of record. In short, Falcon is not entitled to summary judgment on Count I of the City's complaint.

In its second request for declaratory judgment, the City requests a declaration

> that Defendants created and/or permitted the conditions at the locations identified in the Inspection Reports and that these conditions constitute violations and or noncompliance with the Franchise Agreement, MCSP Ordinance, 1998 Agreement, and 2000 Agreement, the NEC, the NESC and other safety requirements, respectively.

(Compl. ¶ 51.) Falcon seeks summary judgment on this count, arguing that: (1) there is no evidence that Falcon violated the NESC or NEC; and (2) the City has waived the strict technical compliance it now seeks to impose. The City responds that the record evidence raises genuine issues of material facts as to whether (1) conditions cited in the Bogie report are accurate; (2) Falcon caused and/or permitted these conditions to exist; and (3) such conditions constitute violations of the NESC and NEC.

Falcon first argues that the Bogie inspection reports do not establish who caused the discrepancies, which would require knowledge of the order in which providers made attachments to the poles.  In Falcon's view, the City's failure to gather information, such as Falcon's attachment permits, which would establish a pole's history of attachments, entitles Falcon to summary judgment.  Falcon also argues that there is no evidence that Falcon violated the NESC and NEC *as applied* by DU.  In essence, Falcon asserts DU's lax enforcement of the technical standards demonstrates the City's failure to apply the NESC and NEC strictly.

The City has raised sufficient questions of material fact as to whether Falcon caused the conditions listed in the Bogie reports.  In his October 2001 and January 2004 reports, Bogie listed over 200 discrepancies that did not involve "clearance" issues or conditions for which a third party may have been to blame.  (Doc. 46, Exs. 53, 54.)  Even while Falcon argues that its "cable plant can, through no fault of its own, be put out of compliance with the NESC based on a third party's actions," Falcon cites no authority for the proposition that it may not be held liable for the discrepancies caused by third parties or that where discrepancies are caused by third parties, Falcon is somehow relieved from its agreement to maintain its cable plant in accordance with NESC standards.

As the Court stated in the *Athens* case,

> Charter has offered no evidence that any citation in Bogie's reports actually are incorrect or improperly attribute a problem to Charter that actually should be

-14-

> attributed to a third-party. Rather, Charter only conjectures that Bogie's
> citations might be wrong or that a third-party might be responsible. Given
> Charter's complete absence of evidence and given the court's obligation to
> accept Bogie's testimony as true and to draw all reasonable inferences in the
> City's favor, Charter has failed to show that it is entitled to summary judgment
> on the question of whether it violated the NEC or the NESC.

*Athens*, No. 03-2430 memo op. at 58-59.

Falcon's second argument is that by DU's flexible enforcement of the NESC and NEC guidelines, the City has waived strict technical compliance with the NESC and NEC. Falcon's argument is unconvincing for a couple of reasons. First, Falcon's Pole Attachment Agreement with the City provides:

> Failure to enforce or insist upon compliance with any of the terms or conditions of this
> Agreement or failure to give notice to declare this Agreement or any licenses granted
> hereunder terminated shall not constitute a general waiver or relinquishment of any
> such terms, conditions or acts but the same shall be and remain at all times in full force
> and effect.

(Doc. 45, Ex. 13 at Art. XIX.)

Falcon argues that this provision not does undermine its waiver argument because the City's actions go beyond mere "failure to enforce or insist upon compliance" with NESC standards. However, the nature of Falcon's argument evidences material issues of fact in dispute with respect to the City's actions and the implications of such.

Moreover, Falcon offers no direct authority for its proposition that the "general 'nonwaiver provision' [of the Pole Attachment Agreement] does not trump the specific waiver provisions that are built into the NESC." (Def.'s Mot. for Summ. J., Doc. 27

at 33.)

Second, "[w]aiver is the voluntary, intentional relinquishment of a known right." *Glass v. United of Omaha Life Ins. Co.*, 33 F.3d 1341, 1347 (11th Cir. 1994). "Waiver requires (1) the existence at the time of the waiver a right, privilege, advantage, or benefit which may be waived; (2) the actual or constructive knowledge thereof; and (3) an intention to relinquish such right, privilege, advantage, or benefit." *Matter of Garfinkle*, 672 F.2d 1340, 1347 (11th Cir. 1982). "When waiver is implied from conduct, the acts, conduct, or circumstances relied upon to show waiver must make out a clear case." *Id.* The fact that between 1998 and 2000, Falcon and the City entered into three agreements[2] which expressly required Falcon's compliance with NESC and NEC standards raises an issue of material fact as to the City's alleged intention, nonetheless, to relinquish its right to strict compliance.

Therefore, Falcon is not entitled to summary judgment on Count II of the City's complaint.

Falcon also seeks summary judgment on the City's request for a declaration that Falcon "has otherwise failed to comply with the Franchise, the MCSP, the 1998 Agreement and the 2000 Agreement." (Compl. ¶ 53.)

The City has raised a genuine issue of fact with respect to Falcon's failure to

---

[2] These agreements include the September 1998 Franchise Agreement, October 1998 revised Pole Attachment Agreement, and February 2000 Franchise Agreement. (Doc. 46, Exs. 19, 20, 22.)

*timely* participate in a joint walkout of its cable system, submit benchmark schedules, provide the City with a performance bond, and provide the City with 30 MHz of bandwidth.

Accordingly, Falcon is not entitled to summary judgment on Count III of the City's complaint.

## II. The Immunity Defenses to Counterclaims for Money Damages

The City seeks summary judgment on each of Falcon's counterclaims, while Falcon seeks summary judgment in its favor on its § 1983 Equal Protection claim, breach of franchise claim, and  two of its requests for declaratory judgment.  The Court will first address the City's federal and state immunity defenses to Falcon's counterclaims.

### A. The Counterclaims for Money Damages Under the Cable Act

The City seeks summary judgment on all of Falcon's claims for monetary damages pursuant to the Cable Act,  47 U.S.C. § 555a(a), which provides:

> (a) Suits for damages prohibited
> In any court proceeding pending on or initiated after October 5, 1992, involving any claim against a franchising authority or other governmental entity, or any official, member, employee, or agent of such authority or entity, <u>arising from the regulation of cable service or from a decision of approval or disapproval with respect to a grant, renewal, transfer, or amendment of a franchise</u>, any relief, to the extent such relief is required by any other provision of Federal, State, or local law, shall be limited to injunctive relief and declaratory relief.

47 U.S.C. § 555a(a) (emphasis added).  In the City's view, this clause bars any claim

-17-

by Falcon for money damages in this case.

Falcon's initial response is that the immunity provided under § 555a(a) is directed at the regulation of "cable service" rather than "cable systems;" and since this action involves a cable system, the bar is inapplicable.[3]  Further, Falcon asserts that its claims do not "aris[e] . . . from a decision of approval or disapproval with respect to a grant, renewal, transfer, or amendment of a franchise."  47 U.S.C. § 555a(a).[4]

In the *Athens* case, precisely the same argument was presented and summarily rejected:

> First, the "regulation of cable service" can logically be read to include the regulation of the "cable system." "Cable service" is defined as "the one-way transmission to subscribers of … video programming," and it is difficult to see how a municipality would regulate that transmission without also regulating the "facility … and control equipment that is designed to provide cable service …." 47 U.S.C.A. § 522(6), (7).
>
> Second, to the extent ambiguity exists, nothing in the legislative history supports Charter's argument that the court should construe § 555a(a) narrowly so as to apply to the regulation of the "transmission to subscribers … of video programing" and not also to the regulation of "the facility … control equipment that is designed to provide" that transmission. To the contrary, the legislative history supports reading § 555a(a) broadly to apply to a municipality's regulation of the cable system. *See* S. Rep. 102-92, at 48 (1991), *reprinted in* 1992 U.S.C.C.A.N. 1133, 1181 (citing, as the impetus to enact § 555a the fact that "[t]he authority of cities to regulate *cable television systems* is

---

[3] Section 522(6) of the Cable Act defines "cable service" as "(A) the one-way transmission to subscribers of (I) video programming, or (ii) other programming service, and (B) subscriber interaction, if any, which is required for the selection or use of such video programming or other programming service." 47 U.S.C. § 522(6). "Cable system," alternatively, is defined as "a facility, consisting of a set of closed transmission paths and associated signal generation, reception, and control equipment that is designed to provide cable service which includes video programming and which is provided to multiple subscribers within a community." 47 U.S.C. § 522(7).

[4] This second assertion, while undisputed, relates to the alternative statutory basis for immunity, and need not be addressed in this opinion.

increasingly challenged in court on various statutory and constitutional grounds"). Indeed, the history supports applying § 555a to all aspects of the municipality's regulation of the cable operator. *See id.* at 49-50, *reprinted in* 1992 U.S.C.C.A.N. at 1182-83 ("Section 628 applies to any action expressly authorized or required by title VI of the 1934 Act, including a franchising authority's decision to grant or deny a franchise, renew or not renew a franchise, approve or deny the transfer of a franchise, amend or not amend a franchise, or *otherwise regulate a cable operator under title VI.*").

*Athens*, No. 03-2430 memo op. at 24-25.

The Court concluded that Congress's purpose in enacting § 555a "was 'to limit the franchising authorities' liability for monetary damages' against lawsuits, like the instant suit, brought by cable companies, like Charter, 'who have not been issued franchises on the terms and conditions they wished,' who 'seek damages from franchising authorities, typically under the Civil Rights Act of 1871 (42 U.S.C. 1983), and parallel State civil rights laws, as well as injunctive relief.'" *Athens*, No. 03-2430 memo op. at 26 (citing S. Rep. 102-92, at 48-50 (1991), *reprinted in* 1992 U.S.C.C.A.N. 1133, 1181-83; *Jones Intercable v. City of Chula Vista*, 80 F.3d 320, 326 (9th Cir. 1996) (describing the purpose of § 555a(a) as protecting municipalities from "potentially crippling civil damages liability claims in relation to their regulation of cable operators.")).    The Court found that the limits Congress imposed on the application of § 555a(a) had nothing to do with the regulation of the cable system, and Falcon's narrow interpretation of § 555a(a) was not supported by the case law. *See Athens*, No. 03-2430 memo op. at 26-27.

This Court is persuaded by the holding in *Athens*. It accurately reflects the

legislative history and congressional intent behind § 555a(a).  Therefore, the City's motion for summary judgment on Falcon's claims for money damages on all of its counterclaims is due to be granted, and Falcon's motion for summary judgment on these counterclaims is due to be denied.

### B.  The City's Municipal Immunity Defense under State Law

Falcon does not contest that it is barred from recovering from the City for intentional torts pursuant to the municipal immunity defense under Alabama law.  *See Scott v. City of Mountain Brook*, 602 So.2d 893, 894 (Ala. 1992) (holding that municipalities are immune from suits for intentional torts and finding that Alabama Code Section 11-47-190 "limits the liability of municipalities to injuries suffered through neglect, carelessness or unskillfulness.") (internal quotations omitted).

Therefore, as a matter of law, the City is immune to Falcon's state law counterclaims for conspiracy (Count IV), misrepresentation (Count V)[5], promissory fraud (Count VI), and intentional interference with existing and prospective business relations (Count VII).  Summary judgment in the City's favor will be granted on these counterclaims.

### III. The Timeliness of the Counterclaims

The City asserts that Falcon's Counterclaims I, III, IV, V, VI, and VII, are

---

[5] Falcon's claims for innocent, mistaken, or reckless misrepresentation under this count are not barred by the municipal immunity defense.  However, as subsequently discussed, these claims are time-barred.

barred by applicable federal and state statutes of limitations.[6]

A. The Timeliness of the Federal Claims

Falcon does not dispute that the applicable statute of limitations for its federal Counterclaims I and IV is the two year limitation imposed by Section 6-2-38(1) of the Alabama Code. *See* ALA. CODE § 6-2-38 (1975); *see also Lufkin v. McCallum*, 956 F.2d 1104, 1105 (11th Cir. 1992) ("the proper statute of limitations for § 1983 actions is the forum state's general or residual statute of limitations for personal injury actions."). On their face, therefore, Falcon's §1983 claims which arose prior to September 29, 2002, are presumptively barred.

"Federal law determines when a statute of limitations begins to run for § 1983 claims." *Lovett v. Ray*, 327 F.3d 1181, 1182 (11th Cir. 2003). "[T]he statute of limitations does not begin to run until the facts which would support a cause of action are apparent or should be apparent to a person with a reasonably prudent regard for his rights." *Id.* (quoting *Rozar v. Mullis*, 85 F.3d 556, 561-62 (11th Cir.1996)).

The City argues that the facts giving rise to Falcon's 42 U.S.C. §§ 1983 and 1985 claims were within Falcon's knowledge more than two years prior to the filing of its counterclaims.[7] Falcon argues that the facts which form the basis of its Equal Protection claim under § 1983 were not apparent until sometime after September 29,

---

[6] These counterclaims were filed on September 29, 2004.

[7] Falcon does not contest the City's argument with respect to the untimeliness of its Due Process and impairment of contracts claims under § 1983.

2002.

"In order to prevail on an equal protection claim based upon the application of a facially neutral statute, it must be establish [sic] that: (1) the plaintiff was treated differently than similarly situated persons; and (2) the defendant unequally applied the facially neutral statute for the purpose of discriminating against the plaintiff." *Strickland v. Alderman*, 74 F.3d 260, 264 (11th Cir. 1996).

Falcon concedes it had knowledge of its substantial similarity to PCL, DU, and BellSouth prior to September 29, 2002. However, Falcon alleges that it did not become apparent prior to September 29, 2002, that the City was intentionally treating them differently, when it became clear that the City did not intend to pursue actions against these other entities for their violations.

Falcon's argument is unpersuasive. As the City argues, Falcon's position that "the fact that PCL's discrepancies were just as bad as Falcon's – if not worse– is a fact that came to light after September 29, 2002," is undermined by Falcon's own inspections of the BellSouth, PCL, and DU plants between October 2001 and July 2002, which purported to identify issues and violations committed by these entities. (Def.'s Mem. Op. in Opp'n to the City's Mot. to Summ. J., Doc. 85 at 15; *see also* Def.'s Notice of Filing Supplementary Evidence in Supp. of Mot. for Summ. J., Doc. 75, Exs. 1-6.) The mere fact that Falcon took the time to conduct these inspections or comparisons evidences its belief that it was being treated differently prior to

-22-

September 29, 2002.

Falcon generally takes the position that its § 1985 conspiracy claim is not barred by the two-year statute of limitations. Unremarkably, it cites no authority for this position, and the Court has not located any.

Accordingly, the City is entitled to summary judgment on Falcon's counterclaims under 42 U.S.C. §§ 1983 and 1985, insofar as they are based upon conduct occurring prior to September 29, 2002.

### B. The Timeliness of the State Law Claims

The City argues that pursuant to Alabama statutes of limitation, the following state law counterclaims are time-barred: conspiracy (Count IV), misrepresentation (Count V), fraud (Count VI), and interference with business relations (Count VII). These claims are subject to the two-year residual statute of limitations. *See* ALA. CODE § 6-2-38 (1975); *Fullman v. Graddick*, 739 F.2d 553, 557 (11th Cir. 1984) (stating that the Alabama statute of limitations for "[a]ctions for any injury to the person or rights of another not arising from contract and not specifically enumerated in this section" is applicable to conspiracy claims) (citation omitted); *see also Smith v. Evans*, 829 So.2d 774, 776 (Ala.Civ.App. 2002) (finding a cause of action for fraud is subject to the two-year residual personal injury statute of limitations).

Moreover, it is the City's position that these claims, as well as Falcon's breach of franchise claim, are time-barred due to Falcon's failure to comply with Alabama's

presentment statute for claims against municipalities, which provides:

> All claims against the municipality (except bonds and interest coupons and claims for damages) shall be presented to the clerk for payment within two years from the accrual of said claim or shall be barred. Claims for damages growing out of torts shall be presented within six months from the accrual thereof or shall be barred.

ALA. CODE § 11-47-23 (1975).

Falcon does not contest that its common law claims are subject to the two year statute of limitations or that it failed to meet the presentment requirement for alleged breaches of franchise occurring prior to September 29, 2002.

Nonetheless, Falcon argues that it may proceed on its breach of franchise claim for alleged breaches occurring after September 29, 2002, due to the City's failure to timely complete make-ready work and its efforts to change the terms of the parties' agreement by attempting to enforce strict compliance with the NESC and NEC, as evidenced by Bogie's January 19, 2004, report.

The "make-ready work" claim necessarily arose no later than September 2001, the deadline for Falcon to complete the rebuild. Falcon was indubitably made aware of the City's intention to enforce strict compliance with the standards of the NESC and NEC as early as August 23, 1999, when the City indicated that "[i]n the interest of clarification, it is significant that in reference to construction and safety issues . . . the City relies on the minimum standards contained within the latest versions of the NEC and NESC." (Pl.'s Opp'n to Def.'s Mot. for Summ. J., Doc. 79, Ex. 34.)   The City

again reiterated its intention to impose compliance with the NESC and NEC in the parties' February 2000 Franchise Agreement which states that "any safety violations will be fixed in accordance to NEC and NESC standards."  (Doc. 46, Ex. 22 at 3.)

In light of Falcon's  total and admitted failure to comply with the presentment requirement within six months of its knowledge of these salient facts, the City is entitled to judgment as a matter of law on the breach of franchise counterclaim; and  Falcon's motion for summary judgment thereon is due to be denied.

Falcon's argues that its misrepresentation counterclaim was  timely filed, since it did not reasonably discover the misrepresentation until June 2004. Falcon states that it "first became aware that the Bogie reports may have misrepresented their nature on June 9, 2004," when Bogie stated in his deposition that the report recorded only discrepancies, not violations.  (Doc. 85 at 23-24.)  Until that day, Falcon asserts that it "was not expecting the Bogie reports to be 'infallible,' but it was relying on the representation that the reports documented ***violations***."  (*Id.* at 24) (emphasis in original).

Undisputed evidence in the record is fatal to Falcon's claim that it did not question the validity of Bogie's reports until 2004.  After receiving the January 2001 Bogie report, Falcon's General Manager, Ted Whittington, wrote a letter to the City stating that the report was "currently under review" and "[e]ach issue found in this report, excluding  make-ready work not within our control [would] be repaired."

-25-

(Doc. 79, Ex. 51 at 3.)  The letter further states that Falcon would work cooperatively to resolve "all other violations identified by the City and [Falcon's] own efforts that require third party assistance." (*Id.*)  These statements establish that Falcon was not only made aware of the violations, but that it accepted *responsibility* for correcting them (excluding make-ready work) as early as February 2001!

Therefore, Falcon's misrepresentation counterclaim is time-barred and the City is entitled to judgment as a matter of law.

## IV. The Remaining Counterclaims

Falcon's remaining counterclaims include its claims for post September 29, 2002, injunctive and declaratory relief under 42 U.S.C. § 1983 (Count I) and 42 U.S.C. § 1985, as well as its Cable Act claim (Count II).  The merits of each will be addressed in turn.

### A. Post-September 2002 Section 1983 Counterclaim

"To prevail on a claim under § 1983,  a plaintiff  must  demonstrate  both (1) that the defendant deprived it of a right secured under the Constitution or federal law, and  (2) that  such  a deprivation occurred under color of state law." *Arrington v. Cobb County*, 139 F.3d 865, 872 (11th Cir. 1998).  "[M]unicipalities and other local government entities are  included  among  those persons to whom § 1983 applies." *Wyke v. Polk County School Bd.*,  129 F.3d 560, 568 (11th Cir. 1997) (citing *Monell v. New York City Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978)).

Falcon alleges that in violation of  42 U.S.C. § 1983, and subsequent to September 29, 2002, the City deprived it of its rights to due process and equal protection and impaired its rights in violation of the Contracts Clause.

### 1. The  Equal Protection Claim

"In order to prevail on an equal protection claim based upon the application of a  facially  neutral statute, it  must  be  establish that: (1)  the  plaintiff  was  treated differently  than similarly situated persons; and (2) the defendant unequally applied the facially neutral statute  for  the purpose of discriminating against the plaintiff." *Strickland*, 74 F.3d at 264 (cited in *Campbell v. Rainbow City, Ala.*, 434 F.3d 1306, 1314 (11th Cir. 2006)).

Here, Falcon argues that: (1) it is similarly situated to PCL, BellSouth, and DU and  that  it  has  been  treated  differently  than  these  entities;  and  (2)  that  the  City unequally applied the NEC and NESC standards for the purpose of discriminating against Falcon.

Falcon's argument does not prevail.  First, Falcon is not similarly situated to PCL,  BellSouth, and DU.  The simple fact that these entities attached to the same utility poles, are subject to the NESC and NEC standards, and have allegedly violated those  standards, is insufficient, standing alone,  to create a genuine issue of material fact as to whether they are similarly situated.  Unlike PCL, BellSouth, and DU, Falcon entered into separate agreements with the City, distinct from its Pole Attachment

Agreement, obligating itself to eliminate all safety violations in its cable system and to bring its system into compliance with the NESC and NEC standards within the specified time frame of three years.  Unlike the other entities, Falcon entered into these agreements in consideration for the transfer and extension of its franchise.

Moreover, it is Eleventh Circuit law that where a plaintiff fails to present evidence that the violations by others of an ordinance are as egregious as those of the plaintiff, the plaintiff has failed to establish a prima facie case that it was similarly situated. *See Strickland*, 74 F.3d at 265.  Falcon has simply failed to establish that the violations of the alleged comparators were as egregious or more egregious than its own.

Second, assuming *arguendo* that  Falcon is similarly situated to the alleged comparators, it failed to raise a genuine issue of fact that the City lacked a rational basis for its unequal application of the NESC and NEC standards.  "Mere error or mistake in judgment when applying a facially neutral statute does not violate the equal protection clause.  There must be intentional discrimination." *E & T Realty v. Strickland*, 830 F.2d 1107, 1114 (11th Cir. 1987) (citation omitted).  Falcon must show that the City selected it for a particular course of action at least in part because of its adverse effects upon an identifiable group. *See id.*

As the *Athens* Court concluded:

> Charter's sole theory for the City's alleged disparate enforcement of the NEC and NESC is the City's desire to extract non-tax revenue from Charter.

-28-

> However, Charter gives no explanation for why that motivation would not
> apply equally to PCL.  In any event, the Eleventh Circuit's standard for
> disparate enforcement is clear.  Charter must show that the City was motivated
> due to Charter's membership in an identifiable group.  Charter has presented
> no such evidence.

*Athens*, No. 03-2430 memo op. at 36.

Therefore, the City is entitled to summary judgment on the Equal Protection counterclaim; and Falcon's motion for summary judgment on said claim is due to be denied.

## 2. The Due Process Counterclaim

Falcon also contends that the City abridged its Due Process rights under 42 U.S.C. § 1983 by failing to provide an opportunity to be heard before the City Council prior to the Council's authorization of the instant action.

Due Process requires notice and the opportunity to be heard at a meaningful time and manner incident to the deprivation of life, liberty, or property, at the hands of the government. *See Mullane v. Central Hanover Bank & Trust Co.,* 339 U.S. 306 (1950); *Fuentes v. Shevin*, 407 U.S. 67 (1972).  "[A] § 1983 claim alleging a denial of procedural due process requires proof of three elements: (1) a deprivation of a constitutionally-protected liberty or property interest; (2) state action; and (3) constitutionally-inadequate process." *Grayden v. Rhodes*, 345 F.3d 1225, 1232 (11th Cir. 2003) (citation omitted).

Falcon has failed to show a deprivation of a constitutionally-protected liberty

or property interest.  Falcon's franchise remains in effect, and the City has not collected any fines or penalties from Falcon pursuant to the MCSP Ordinance. Legislative deliberations leading to the commencement of this action did not deprive Falcon of any conceivable liberty or property interest. A municipal or state government is simply not required to provide a prospective defendant with notice and an opportunity to be heard prior to the commencement of a lawsuit.

Accordingly, the City is entitled to judgment as a matter of law on Falcon's Due Process claim.

### 3.  Falcon's Impairment of Contracts Claim

Falcon asserts that the City violated its rights under the Contracts Clause of the United States Constitution.

Pursuant to Article I, Section 10, "[n]o state shall . . . pass any . . . Law impairing the Obligation of Contracts . . . ." U.S. CONST. art. I, § 10, cl. 1. "In evaluating a Contracts Clause claim, the court must determine whether the state law operates as a ***substantial impairment*** of a contractual relationship and if so, whether the impairment is necessary to meet an important government interest." *Flanigan's Enter., Inc. of Ga. v. Fulton County, Ga.*, 242 F.3d 976, 989 (11th Cir. 2001) (citations omitted) (emphasis added).

Falcon has failed to raise a genuine issue of material fact that it has suffered a substantial impairment of its contractual relationship with the City.  Falcon continues

to enjoy the rights and privileges of its Franchise Agreement, which remains in effect.

Again, the City is entitled to judgment as a matter of law on this counterclaim.


## B. The Cable Act Counterclaim

Falcon seeks two declarations pursuant to the Cable Act.  First, Falcon requests the Court find:

> The City of Decatur is prohibited by the Cable Act, as amended, and by other federal law from collecting any costs and expenses from Charter Communications associated with the City's alleged enforcement and verification of compliance with the Cable Ordinance, the Pole Attachment Agreement, the MCSP Ordinance and the other ordinances and resolutions discussed herein, in excess of the amount of the franchise fees payable by Charter Communications as a percentage of its gross revenue under Section 622 of the Cable Act, as amended . . . .

(Doc. 9 at 27-28.)  Falcon alleges that despite the Cable Act's fee limit of "5 percent of such cable operator's gross revenues," the City has extorted additional fees through the 1998 and 2000 agreements, as well as through potential fines provided for under the MCSP Ordinance.  47 U.S.C. § 542(b).

Falcon's argument is unpersuasive.  Falcon contracted in its 1998 and 2000 agreements to pay additional money to the City in consideration for the transfer and extension of its franchise.  Falcon cites no authority for the proposition that a City and a cable operator may not contract to pay additional money in consideration of benefits independent of the franchise.  To the extent Falcon's counterclaim is based on its potential liability for fees under the MCSP Ordinance, its claim is not ripe for

adjudication.

Falcon additionally seeks a summary declaration that

> [T]he MCSP Ordinance conflict[s] with and is preempted . . . by the Cable Act
> . . . [and] the Communications Act of 1934 . . . and [is] null, void and of no
> effect to the extent that [it is] preempted or conflict[s] with federal law . . . .

(Doc. 9 at 27.)  Falcon asserts that the MCSP Ordinance imposes application, as well

as other fees and costs on cable operators and imposes material terms and conditions

on franchise renewal in violation of the Cable Act.

It is undisputed that the sections on which Falcon bases its argument have never

been applied against Falcon.  Therefore, this claim is also premature and not ripe for

adjudication.

Accordingly,  the  City's  motion  for  summary  judgment  on  Falcon's

Counterclaim II is due to be granted, and Falcon's motion is due to be denied.


### C. The Section 1985 Conspiracy Counterclaim

To prevail on its 42 U.S.C. § 1985 counterclaim, Falcon must show:

> (1) a conspiracy, (2) for the purpose of depriving, either directly or indirectly,
> any person or class of persons of the equal protection of the laws, or of equal
> privileges and immunities under the laws; and (3) an act in furtherance of the
> conspiracy, (4) whereby a person is either injured in his person or property or
> deprived of any right or privilege of a citizen of the United States.

*Childree v. UAP/GA CHEM, Inc.*,  92 F.3d 1140, 1147 (11th Cir. 1996) (citations

omitted).  Moreover, "a claim under § 1985(3) requires the proof of invidious

discriminatory intent as well as the violation of a serious constitutional right protected not just from official, but also from private encroachment." *Trawinski v. United Technologies*, 313 F.3d 1295, 1299 (11th Cir. 2002) (citation omitted).

Falcon has failed to raise a genuine issue of material fact that the City conspired with anyone to do anything. Moreover, it has not established by competent evidence that the City conspired with anyone to violate Falcon's constitutional rights.

For want of genuinely disputed material facts, the City is entitled to judgment as a matter of law on Falcon's federal civil rights conspiracy counterclaim (Count IV).

## CONCLUSION

By separate order, the City's motion for summary judgment will be GRANTED in its favor on all of Falcon's counterclaims (Counts I, II, III, IV, V, VI, and VII).

Falcon's motion for summary judgment on Counterclaims I, II, and III will be DENIED. Falcon's motion for summary judgment on the City's three requests for declaratory judgment relief will likewise be DENIED.

Done the 30th day of March, 2007.

_____
U.W. Clemon
United States District Judge

-33-